## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Tomas Tomas-Pedro, *et al.*,                                    Case No. 3:18-CV-01136-JGC

          Plaintiffs

      v.                                                            **ORDER**

Trooper Bryan Holden,

          Defendant.


This is civil rights case arising under 42 U.S.C. § 1983. Plaintiffs, three Guatemalan

citizens, assert constitutional claims against an Ohio state trooper in connection with a traffic

stop that ultimately led to Border Patrol detaining them.

Following the traffic stop, the government placed the plaintiffs in removal proceedings,

and at least one has since been deported to Guatemala.

Plaintiffs argue that the defendant, Trooper Bryan Holden, pulled them over without

probable cause, prolonged the traffic stop, and did so because they are Hispanic, in violation of

plaintiffs' Fourth and Fourteenth Amendment rights. Defendant Holden asserts that he pulled

them over for following too closely behind the vehicle in front of them, which is a violation of

Ohio Rev. Code § 4511.34.

Pending is defendant's motion for summary judgment (Doc. 50). For the reasons

described below, I grant the motion.

### Background

On May 23, 2016, plaintiffs Tomas Tomas-Pedro, Manuel Xol-Mo, and Williams Xol-

Mo were traveling eastbound on I-80 in Sandusky County, Ohio. (Doc. 50-2, pgID 429; Doc. 50-6, pgID 826-27). Tomas-Pedro and Manuel Xol-Mo had traveled to Ohio to pick up Williams Xol-Mo and were on their way back to New York. (Doc. 50-6, pgID 826). Tomas-Pedro was driving the car. (*Id.*, pgID 826-27; Doc. 50-2, pgID 417-18). Manuel and Williams Xol-Mo, who are brothers, were passengers. (Doc. 51-2, pgID 1157).

Defendant Holden, a trooper with the Ohio State Highway Patrol, was patrolling the area that day. (Doc. 50-1, pgID 301). He was on co-patrol with a United States Border Patrol agent, Santiago Mateo.[1] *Id.*

Defendant Holden and Agent Mateo were sitting in a highway crossover when defendant Holden claims that he saw Tomas-Pedro following too closely behind the vehicle in front of him.[2] (Doc. 50-2, pgID 429). Tomas-Pedro was traveling at about 65 miles per hour, and conditions were clear. (Doc. 50-6, pgID 830; Doc. 51-3, pgID 1160). At about 11:44 AM, defendant Holden pulled out of the crossover, activated his overhead lights, and stopped plaintiffs' vehicle. (Doc. 51-1, pgID 1155).

Plaintiffs dispute that Tomas-Pedro was following too closely behind another vehicle. Tomas-Pedro first testified that there were no cars in front of him in the same lane when

---

[1] The co-patrol between the United States Border Patrol and the Ohio State Highway Patrol is part of Operation Quick Hatch. This operation aims to "detect, interdict, and apprehend those engaged in human and contraband trafficking." (Doc. 51-5, pgID 1168). Its mission statement further explains that it is intended to mitigate "the unlawful movement of undocumented aliens and other contraband." (*Id.*, pgID 1169). The partnership allows the Ohio State Highway Patrol to benefit from Border Patrol's additional resources, including supplementary criminal and immigration databases. (Doc. 50-1, pgID 301-02).

[2] The applicable Ohio law provides: "The operator of a motor vehicle [ . . . ] shall not follow another vehicle [ . . . ] more closely than is reasonable and prudent, having due regard for the speed of such vehicle [ . . . ] and the traffic upon and the condition of the highway." Ohio Rev. Code Ann. § 4511.34. The Sixth Circuit has accepted the rule of thumb that to be in compliance with this law, a vehicle should be at least one car length behind the vehicle in front of it for every ten miles per hour it is traveling. *United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009).

defendant Holden pulled him over. (Doc. 50-6, pgID 866-67). He then testified that he could not remember whether there were any cars in front of him in the same lane but estimated that the closest car in front of him was nine or ten meters away. (*Id.*, pgID 898-900). He stated several times that he was not following too closely behind another vehicle. (*Id.*, pgID 865-66, 965).

Manuel Xol-Mo, who was sitting in the passenger seat, testified that there were cars traveling in front of Tomas-Pedro in the same lane but that Tomas-Pedro was not following too closely behind those cars. (Doc. 50-7, pgID 992-93, 1015).

Williams Xol-Mo was asleep at the time that defendant Holden pulled over the car and therefore could not testify about what occurred. (Doc. 50-8, pgID 1096).

After stopping plaintiffs' car, defendant Holden got out of his vehicle and motioned for Tomas-Pedro to walk toward him. (Doc. 50-6, pgID 834). Tomas-Pedro complied and stood behind plaintiffs' vehicle. (*Id.*, pgID 835-37). Agent Mateo was within earshot.[3] (*Id.*, pgID 838-39; Doc. 50-2, pgID 433-34).

Defendant Holden informed Tomas-Pedro that he stopped him for following too closely behind another vehicle. (Doc. 50-6, pgID 835). He asked Tomas-Pedro for his driver's license and insurance. (*Id.*, pgID 836; Doc. 50-2, pgID 434-35). Tomas-Pedro admitted that he did not have a driver's license but stated that he had an identification card from the Guatemalan consulate. (*Id.*).

About two minutes into the stop, Agent Mateo began translating for defendant Holden. (Doc. 50-6, pgID 837). While Tomas-Pedro testified that he could understand about 75 percent

---

[3] Defendant Holden testified that he wanted Agent Mateo to be close by during traffic stops because Border Patrol "wanted to be a part in and included in everything to see how we were handling ourselves, including the roadside interview. So the only way to really do that was wave the driver back so Agent Mateo could hear exactly what I was talking about and the questions I was asking." (Doc. 50-2, pgID 433-34).

of defendant Holden's words, Agent Mateo speaks fluent Spanish and could converse more easily with Tomas-Pedro. (*Id.*).

Defendant Holden asked Agent Mateo to retrieve Tomas-Pedro's wallet from the vehicle, which he did. (*Id.*, pgID 841). Once Agent Mateo returned with the wallet, he handed it to defendant Holden, who removed Tomas-Pedro's identification card. (*Id.*, pgID 843). Defendant Holden then asked Agent Mateo to discuss the nature of the stop with Tomas-Pedro. (Doc. 50-2, pgID 435-36). Defendant Holden testified that he then returned to his patrol vehicle to run the car's registration, but Tomas-Pedro testified that he remained next to Agent Mateo. (*Id.*; Doc 50-6, pgID 846).

According to Tomas-Pedro, Agent Mateo then began asking him questions about his immigration status. (Doc. 50-6, pgID 844). This conversation occurred about seven minutes into the stop, at around 11:51 AM. (*Id.*, pgID 846). Agent Mateo asked whether Tomas-Pedro was an American citizen or if he had permission to work in the United States. (*Id.*, pgID 845). Tomas-Pedro responded no to both questions. (*Id.*, pgID 845).

Agent Mateo then told Tomas-Pedro that he was placing him under arrest because he did not have any legal status in the United States. (*Id.*, pgID 847-51). Defendant Holden handcuffed Tomas-Pedro and placed him in the back of the patrol vehicle. (*Id.*).

Agent Mateo subsequently returned to plaintiffs' vehicle and asked Manuel Xol-Mo and Williams Xol-Mo about their immigration status and to provide identification documents. (Doc. 50-7, pgID 1008; Doc. 50-8, pgID 1100-01). Manuel and Williams both estimate that this occurred about twenty to twenty-five minutes after Agent Mateo retrieved Tomas-Pedro's wallet from the car. (*Id.*). After reviewing their documents, Agent Mateo ordered Manuel Xol-Mo and

Williams Xol-Mo to exit the vehicle, handcuffed them, and detained them. (Doc. 50-7, pgID 1013-14; Doc. 50-8, pgID 1107-08).

According to the Incident Recall Report for the traffic stop, either defendant Holden or Agent Mateo called a tow truck at 12:01 PM. (Doc. 51-1, pgID 1155). Additional Border Patrol agents arrived on the scene at 12:18 PM. (*Id.*). The incident was "closed" at 12:59 PM. (*Id.*, pgID 1156).

## Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant initially must show the absence of a genuine issue of material fact. *Id.* at 323. "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008) (quoting *Celotex*, *supra*, 477 U.S. at 325).

Once the movant carries its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

Summary judgment is proper where "in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

5

**Discussion**

Plaintiffs bring this action under 42 U.S.C. § 1983, which allows them to recover if government officials have violated their civil rights.

In such cases, qualified immunity protects government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Once the defendant has raised the defense of qualified immunity, it is the plaintiff's burden to show that the defendant is not entitled to such immunity. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

The test for application of qualified immunity is well established and contains two parts: 1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and 2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*, *supra*, 555 U.S. at 232 (citations omitted). If the answer to either of those questions is no, the defendant is entitled to qualified immunity. *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). If the answer to both is yes, qualified immunity does not apply. *Id.*

Plaintiffs in this case assert that defendant Holden violated their Fourth and Fourteenth Amendment rights during the traffic stop and that he is not entitled to qualified immunity for those violations.

They argue that defendant Holden violated their Fourth Amendment rights in two ways: 1) he did not have probable cause to stop them, and 2) he impermissibly prolonged the stop beyond its original scope to inquire about plaintiffs' immigration status.

Plaintiffs also argue that defendant Holden violated their Fourteenth Amendment rights by 1) stopping them because they are Hispanic, and 2) prolonging the traffic stop because they are Hispanic.

### 1.  Fourth Amendment

### A.  Probable Cause

Plaintiffs first argue that there is a dispute of material fact as to whether Tomas-Pedro was following too closely behind the vehicle in front of him, and therefore, as to whether defendant Holden had probable cause to stop him. Plaintiffs point to the testimony of Tomas-Pedro and Manuel Xol-Mo, in which they repeatedly state that they were not following too closely behind any vehicles in front of them. Plaintiffs also emphasize that defendant Holden could not recall many details of the traffic stop, including how closely Tomas-Pedro was following the vehicle in front of him.

Defendant Holden responds that there is no dispute of material fact as to whether Tomas-Pedro was following too closely or whether he had probable cause to make the stop. Defendant highlights Tomas-Pedro's testimony that he was nine or ten meters behind the cars in front of him and Manuel Xol-Mo's testimony that there were cars in front of them in the same lane. Taken together, defendant argues, this testimony establishes that plaintiffs were traveling nine to ten meters behind a car in the same lane, and therefore, they violated Ohio law.[4]

It is well established that "police may make a stop when they have probable cause to believe a civil traffic violation has occurred." *United States v. Sanford*, 476 F.3d 391, 394 (6th

---

[4] Defendant represents that when considering the measurements of plaintiffs' car specifically, plaintiffs were traveling just over two car lengths behind the vehicle in front of them. The Ohio statute requires one car length of distance for every ten miles per hour of speed. Given their speed of about 65 miles per hour, plaintiffs should have been traveling six-and one-half car lengths behind the vehicle in front of them, if there were a vehicle in the same lane.

Cir. 2007). Probable cause means that the officer has "a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Alexander*, 528 F. App'x 515, 518 (6th Cir. 2013). Stated otherwise, there is probable cause where "the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotation marks omitted) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

The subjective intent of the officer is not relevant to a Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996). The appropriate basis for objecting to selective enforcement of the law based on a factor such as race or ethnicity is under the Fourteenth Amendment. *Id.* Rather, the inquiry under the Fourth Amendment is one of objective reasonableness. *Id.*

In a civil case involving the Fourth Amendment, the plaintiff bears the burden of proving the absence of probable cause. *See Provience v. City of Detroit*, 529 F. App'x 661, 667 (6th Cir. 2013) (plaintiff has burden in false arrest cases); *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007) (plaintiff has burden in malicious prosecution cases). Plaintiffs here do not dispute that they have the burden to show that defendant Holden did not have probable cause to stop them.

As an initial matter, I do not agree with defendant Holden that Tomas Pedro's and Manuel Xol-Mo's testimony proves that their car was traveling nine to ten meters behind a car in front of them in the same lane. While Tomas-Pedro testified that there were cars ahead that were about nine or ten meters away, he did not say that those cars were in the same lane. Manuel testified that there were cars in front of them in the same lane but did not testify about how far

8

away those cars were. These separate pieces of testimony do not together prove that plaintiffs were following too closely, in violation of Ohio law. Plaintiffs' testimony is inconclusive, not dispositive.

Regardless, as discussed above, it is not defendant Holden's burden to show the presence of probable cause in this civil action.[5] Rather, it is plaintiffs' burden to show the absence of probable cause. And I find that they cannot meet that burden.

The only evidence that plaintiffs point to in support of their position that defendant Holden did not have probable cause is Tomas-Pedro's and Manuel's testimony that they were not following too closely behind any cars. But this testimony is vague and conclusory. It does not create a genuine issue of material fact.

Plaintiffs' testimony amounts to an unsupported assertion that they did not violate Section 4511.34, the Ohio statute prohibiting drivers from following too closely behind another vehicle. It is essentially a legal conclusion.

For example, Tomas-Pedro testified that "I was not driving closer to – behind another car." (Doc. 50-6, pgID 865). He further testified, "there were vehicles, but they were not close" and "'[t]hey were far away, not close to me." (*Id.*, pgID 897-98).

Manuel Xol-Mo's testimony was similarly vague. When asked what he would consider to be following too closely, he stated, "Let's say, yes, if he was going too close behind the other

---

[5] While plaintiffs are correct that defendant Holden does not remember many specific details about the traffic stop, there is evidence in the record supporting his determination of probable cause. First, there is the citation that defendant Holden issued to Tomas-Pedro for a violation of Section 4511.34. (Doc. 51-3, pgID 1160). Additionally, defendant Holden testified that he recalls stopping the plaintiffs for following too closely. (Doc. 50-2, pgID 429-30). He also testified to the rule of thumb that he routinely applies in making stops for following too closely – that there should be at least one car length of space for every ten miles per hour that the car is traveling. (*Id.*, pgID 527).

vehicle. But no, he was not close." (Doc. 50-7, pgID 1015). Manuel also testified that Tomas-Pedro was "going okay" and his distance was "[t]he normal, when the cars travel ahead and behind." (*Id.*, pgID 993, 1015).

Plaintiffs cite to a case from this district, *Thomas v. Arnold*, 696 F. Supp. 2d 882 (N.D. Ohio 2010) (Zouhary, J.), in support of their argument that there is a genuine issue of material fact here.

In *Thomas*, a police officer stopped the plaintiffs for crossing over the white line on the highway. The plaintiffs sued under Section 1983, alleging that the officer did not have probable cause to make the stop and instead pulled them over because of their race. There was conflicting testimony concerning whether the plaintiffs crossed the white line – the officer testified that they did, and the plaintiffs testified that they did not. *Id.* at 886. The court denied summary judgment, holding that because there was conflicting testimony on the existence of the underlying violation, there was a dispute of material fact. *Id.* at 887.

But *Thomas* is distinguishable from the current case. In *Thomas*, the parties' testimony was based in fact. The plaintiffs either did or did not cross the line, and that is a fact that a lay witness can ascertain. Here, however, plaintiffs' testimony is not based in fact. When plaintiffs testified that they were not following too closely behind a vehicle in front of them, they expressed a conclusion. They essentially asserted that they were not following another vehicle closer than is required by Ohio law, and therefore, they did not violate Ohio law. This is not a factual statement like the ones made in *Thomas*.

The Sixth Circuit recognized this distinction between fact and conclusion in *United States v. Dukes*, 257 F. App'x 855 (6th Cir. 2007). That case, like this one, involved an alleged violation of Section 4511.34, the Ohio law for following too closely. The district court found that

"'if Defendant, in her own estimation, believed that, under the circumstances, she was providing enough room between herself and the semi in front of her,' she would be in compliance with the statute." *Id.* at 858 (citing *United States v. Dukes*, 444 F. Supp. 2d 822, 829 (S.D. Ohio 2006)). The Sixth Circuit held that this determination was erroneous, stating that "[n]o case concludes that a driver's opinion of her own reaction time is the sole determination of a violation; indeed, this subjective assessment of a violation would preclude an officer from ever knowing if someone was breaking the law." *Id.*

Like in *Dukes*, plaintiffs' testimony here amounts to a subjective assessment of a violation. Such testimony is not factual and therefore is insufficient to create a genuine issue of material fact.

As defendant correctly asserts, plaintiffs "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, *supra*, 477 U.S. at 252.

For the reasons discussed above, I find that there is insufficient evidence upon which a jury reasonably could find that defendant Holden lacked probable cause for the traffic stop. Therefore, I grant summary judgment as to this Fourth Amendment claim.

### B.  Prolongation of the Stop

Plaintiffs also claim that defendant Holden violated their Fourth Amendment rights by unlawfully prolonging the traffic stop to inquire about their immigration status. Plaintiffs argue that defendant's prolongation of the stop was unconstitutional because 1) it does not take thirty-

four to fifty minutes to issue a citation for following too closely, 2) defendant Holden did not do any additional investigation that would have justified the lengthened detention, and 3) defendant Holden did not uncover any new facts during the stop that would have led him to suspect that plaintiffs committed a new criminal offense. (Doc. 51, pgID 1149).

Defendant responds that the duration of the stop was constitutional because plaintiffs' own actions and admissions expanded its scope. He argues that once Tomas-Pedro produced only a Guatemalan identification card, the nature of the stop changed. This new information gave Agent Mateo reason to investigate Tomas-Pedro's immigration status, and he admitted that he did not have legal status in the United States. Subsequently, Manuel Xol-Mo also admitted that he was not legally in the country, and Williams Xol-Mo presented an expired visa. According to defendant, these admissions provided justification to expand the stop and detain the plaintiffs.

The Sixth Circuit has explained that "[s]topping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F. 3d 535, 539 (6th Cir. 2009) (internal quotation marks omitted). Even if a seizure such as a traffic stop is lawful at its inception, it "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

To determine whether police conduct during a traffic stop is reasonable, I look to the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* requires that detentions be "limited in [both] scope and duration." *Everett*, *supra*, 601 F.3d at 488 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Accordingly, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period

12

of time," and the stop must "last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 488-89 (internal quotation marks omitted).

The law generally prohibits police officers from detaining a motorist longer than is necessary to issue a traffic citation. *Bell*, *supra*, 555 F.3d at 539. But they can do so if "something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."[6] *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Additionally, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop [ . . . ] do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

Ultimately, "the touchstone of any Fourth Amendment analysis is reasonableness," and an evaluation of reasonableness is "fact-bound, context-dependent," and case-specific. *Everett*, *supra*, 601 F.3d at 493-94. Accordingly, the central issue here is whether "the totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole [ . . . ] was reasonable." *Id.* at 494.

Here, it is undisputed that defendant Holden initiated the traffic stop at 11:44 AM. He first asked Tomas-Pedro for his driver's license and insurance, which is a typical line of questioning during a traffic stop. *See Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (ordinary inquiries incident to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's

---

[6] "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist." *Bell*, *supra*, 555 F.3d at 540. It is "more than an ill-defined hunch" and "must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *Id.*

13

registration and proof of insurance."). Tomas-Pedro responded that he did not have a driver's license but had a Guatemalan identification card.

At about 11:46 AM, two minutes into the stop, defendant Holden asked Agent Mateo to begin translating because he and Tomas-Pedro were having difficulty communicating. Defendant Holden then asked Agent Mateo to retrieve Tomas-Pedro's identification card from the vehicle, as he had still not seen proof of the driver's identity.

By about 11:51 AM, seven minutes into the stop, Tomas-Pedro had admitted that he did not have legal status in the United States.

Plaintiffs focus in their briefs on the length of the traffic stop as a whole, arguing that it does not take thirty-four to fifty minutes to cite a driver for following too closely. However, they fail to address that Tomas-Pedro admitted he did not have legal status only seven minutes into the traffic stop, a much shorter time frame.

And while there is no period of time for a traffic stop that is per se reasonable or unreasonable under the Fourth Amendment, plaintiffs continually rely on the testimony of defendant Holden that a traffic stop for following too closely generally lasts fifteen to twenty minutes.  Seven minutes is less than half of that time.

Additionally, there is no evidence in the record that defendant Holden asked the plaintiffs about their immigration status. It was Agent Mateo who began to question plaintiffs about their status once Tomas-Pedro produced a Guatemalan identification card. Defendant Holden simply asked Tomas-Pedro for his identification and insurance and informed him that he pulled him over for following too closely behind another car.

14

Plaintiffs have failed to identify any cases establishing that Agent Mateo did not have the authority to question plaintiffs about their immigration status, especially after none produced documents indicating that they were legally present in the United States.[7]

Plaintiffs highlight several cases that they argue clearly establish that defendant Holden unconstitutionality prolonged the traffic stop. They first cite to *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008). In that case, a police officer pulled over the defendant for a traffic violation and proceeded to ask him a series of questions about his immigration status after he produced only a Mexican driver's license. *Id.* at 571. There, the government argued that the police officer had a reasonable suspicion that the defendant was involved in a drug-related crime. Therefore, the officer was justified in prolonging the stop to investigate that suspicion. *Id.* at 574.

The Sixth Circuit disagreed, finding that the officer did not have reasonable suspicion of criminal activity and instead, prolonged the stop to investigate the defendant's immigration status.[8] *Id.* at 575.

---

[7] Plaintiffs emphasize that it was defendant Holden, not Agent Mateo, who placed Tomas-Pedro in handcuffs. They also highlight that defendant Holden placed Tomas-Pedro in the back of his highway patrol vehicle. In emphasizing these points, plaintiffs argue that it was defendant Holden who placed Tomas-Pedro under arrest for violating the immigration laws, he does not have the authority to do so, and therefore, his arrest was unconstitutional. But Tomas-Pedro testified that it was Agent Mateo who told him that he was placing him under arrest, not defendant Holden. (Doc. 50-6, pgID 847). And plaintiffs fail to present any authority establishing that Tomas-Pedro's arrest was unconstitutional simply because defendant Holden was the person who handcuffed him.

[8] At the time of the stop, the officer mistakenly believed that the defendant could not legally drive in Tennessee with a Mexican driver's license. *Urrieta, supra*, 520 F.3d at 575. But the government later conceded that he, in fact, could. *Id.* at 574. Therefore, the fact that the defendant produced a Mexican driver's license could not be a basis to extend the detention. *Id.* In discussing these issues, the court also noted that the officer did not have authority under Tennessee law to enforce violations of civil immigration law, as he seemed to be doing in that case. *Id.*

15

While some of the underlying facts are similar to the current case, *Urrieta* is distinguishable in several important ways. First, the *Urrieta* opinion deals chiefly with whether the police officer had reasonable suspicion that the defendant was engaged in a drug-related crime. That is not at issue here. Furthermore, in *Urrieta*, the defendant produced a valid Mexican driver's license, whereas plaintiff Tomas-Pedro produced a Guatemalan identification card that was not a driver's license.

Most significantly, the person who questioned and detained the defendant in *Urrieta* was the police officer initiating the stop. Tennessee law is clear that he did not have authority to enforce civil immigration laws, and he was not on patrol with any individuals who had that authority. This stands in contrast to the current case. Plaintiffs here do not contend that defendant Holden asked them any questions about their immigration status. Rather, it appears that he only asked them for identification and insurance. Agent Mateo, whose duty it is to enforce the immigration laws, was the person who questioned plaintiffs about their status in the United States and ultimately communicated to them that he was placing them under arrest.

Therefore, *Urrieta* does not clearly establish that defendant Holden unconstitutionally prolonged plaintiffs' detention.

Plaintiffs also point to *Arizona v. United States*, 567 U.S. 387 (2012) for the proposition that it violates the Fourth Amendment for state law enforcement to enforce civil immigration laws. But *Arizona* dealt chiefly with preemption of several state laws related to immigration violations, and the Court did not conduct a Fourth Amendment analysis. This case is distinguishable on that basis alone.

The Court opined that it is generally not a crime for a removable individual to remain in the United States and that a police officer will normally not have the "usual predicate for an

16

arrest" if he or she stops an individual solely based on possible removability. *Id.* at 407. However, this discussion assumes that the police officer is the person making the arrest. As I discussed above, defendant Holden was not alone during the traffic stop. He was accompanied by a Border Patrol officer whose duty it is to enforce the immigration laws. Therefore, *Arizona* is inapposite and does not clearly establish a constitutional violation.

Furthermore, courts in this Circuit have held that even where immigration officials are not initially present, police officers may prolong a traffic stop until Border Patrol arrives.

In *Gomez Alvarado v. Beard*, No. 3:18 CV 589, 2020 WL 516284, at *3 (N.D. Ohio) (Zouhary, J.), the court found that it was not a violation of clearly established law to detain three individuals and their children for about ninety minutes until Border Patrol arrived. These individuals were fishing without a license, did not produce sufficient identification, and subsequently admitted that they were in the country illegally.

And in *Lazcano v. Morrow*, No. 1:18-CV-02784, 2020 WL 4754340, at *7 (N.D. Ohio) (Barker, J.), the court held that it was not a violation of clearly established law to hold several individuals for sixteen minutes until Border Patrol arrived. In that case, the driver did not have a license, and the officer testified that he needed Border Patrol to verify the driver's identity since they have a more advanced computer system.

Although these cases differ from the current one in that Border Patrol was not initially involved in the stop, that distinction works against plaintiffs. With Border Patrol already on the scene, there was no need for defendant Holden to hold plaintiffs until Border Patrol arrived. To the contrary, Agent Mateo began questioning Tomas-Pedro about his immigration status almost immediately after Tomas-Pedro failed to produce any documents giving him legal status in the

United States, only seven minutes into the traffic stop. In *Gomez Alvarado* and *Lazcano*, the plaintiffs waited ninety and sixteen minutes respectively.

Plaintiffs also highlight the amount of time that Manuel and Williams Xol-Mo waited until Agent Mateo began questioning them. Both of them testified that he did not begin questioning them until about twenty or twenty-five minutes after he retrieved Tomas-Pedro's wallet from the car.[9] Since Agent Mateo retrieved the wallet about seven minutes into the stop, that means that according to Manuel and Williams Xol-Mo, he began questioning them about twenty-seven to thirty-two minutes into the stop.

The Incident Recall Report, on the other hand, notes that someone called a tow truck at 12:01 PM, seventeen minutes into the stop. (Doc. 51-1, pgID 1155). Defendant Holden asserts that neither he nor Agent Mateo would have called a tow truck if any of the three plaintiffs could have driven the car away. It then follows, defendant argues, that he and Agent Mateo were aware of the plaintiffs' illegal status seventeen minutes into the stop and only then called the tow truck.

Whether Agent Mateo began questioning Manuel and Williams Xol-Mo thirty-two or seventeen minutes into the stop, plaintiffs have not presented authority clearly establishing that this was a violation of their Fourth Amendment rights. While defendant Holden testified that it normally takes him fifteen to twenty minutes to issue a citation for following too closely, this was not a normal traffic stop. The nature of the stop changed once Tomas-Pedro could not produce any documents establishing legal status in the United States.

When that occurred, Agent Mateo had a duty to investigate further, which he did by asking additional questions and ultimately placing Tomas-Pedro under arrest. After discussing

---

[9] When Agent Mateo retrieved Tomas-Pedro's wallet, he instructed Manuel and Williams Xol-Mo to stay in the car. (Doc. 50-7, pgID 1005). They were not free to leave.

18

the situation with Tomas-Pedro, Agent Mateo made his way back to the car to question Manuel and Williams. He then discovered that neither had proof of legal status in the United States.

As previously discussed, the ultimate inquiry under the Fourth Amendment is reasonableness. Here, it would not have been reasonable to allow any of the plaintiffs to drive away without knowing whether they possessed valid driver's licenses. Plaintiffs do not argue otherwise. Accordingly, Manuel and Williams had to wait in the car until Agent Mateo finished questioning Tomas-Pedro, given that Agent Mateo was the only officer who spoke Spanish.[10]

And while it took some time for defendant Holden and Agent Mateo to investigate the situation, there is no evidence suggesting that they engaged in irrelevant lines of questioning or unnecessarily expanded the scope of the stop. They responded to the situation as it unfolded and evolved.

For the reasons discussed above, I find that there is insufficient evidence upon which a jury could reasonably find that defendant Holden unconstitutionally prolonged the traffic stop. Therefore, I must grant summary judgment on this Fourth Amendment claim.

### 2.  Fourteenth Amendment

Plaintiffs also bring a claim for selective enforcement under the Fourteenth Amendment's Equal Protection Clause. They argue that defendant Holden violated their rights because he 1) stopped them because they are Hispanic and 2) prolonged their detention because they are Hispanic.

---

[10] Once defendant Holden determined that none of the plaintiffs had valid driver's licenses, he would have taken them into custody in any event. Due to concerns for the safety of plaintiffs, defendant Holden would have transported them, as is customary according to my experience, to the closest Ohio State Highway Patrol post.

19

In support, plaintiffs highlight that defendant Holden was co-patrolling with a Border Patrol agent, defendant Holden quickly asked Agent Mateo to translate even though he was able to communicate with Tomas-Pedro, defendant Holden did not run plaintiffs' information in his computer, and defendant Holden testified that he would normally be able to see a driver before pulling him or her over.

Defendant Holden responds that plaintiffs have not satisfied the requirements of a selective enforcement claim because they have not presented evidence that he did not stop similarly situated drivers outside the plaintiffs' protected category. Additionally, plaintiffs cannot show that defendant Holden's actions had a discriminatory purpose or effect.

To establish a claim for selective enforcement, plaintiffs must satisfy the following elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).

This standard is a "demanding one." *Conrad v. City of Berea*, 243 F. Supp. 3d 896, 902 (N.D. Ohio 2017) (Gwin, J.). "[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary." *Gardenhire*, *supra*, 205 F.3d at 319.

Regarding the first prong, the Sixth Circuit has emphasized that "it is an absolute requirement that the plaintiff make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted." *Id.* In this case, plaintiffs must make an initial

showing that defendant Holden treated similarly situated non-Hispanic individuals differently than he treated plaintiffs with respect to any aspect of the traffic stop. In essence, plaintiffs must provide support for their contention that defendant Holden either stopped plaintiffs or prolonged the stop because they are Hispanic.

Plaintiffs have failed to do so. In their briefing, plaintiffs focus on suspicious aspects of the stop that they argue show defendant Holden was acting in a discriminatory manner toward plaintiffs. However, they do not discuss how defendant Holden treated any individuals other than plaintiffs. This failure of proof is fatal to plaintiffs' selective enforcement claim.

With respect to defendant Holden's decision to stop plaintiffs for following too closely, plaintiffs do not present any admissible evidence showing that he would not have stopped a non-Hispanic driver under the same circumstances. For example, there is no evidence that defendant Holden stopped Hispanic drivers for following too closely more frequently than non-Hispanic drivers. Or that he stopped Hispanic drivers more frequently for traffic violations in general than he stopped non-Hispanic drivers.[11]

And with respect to plaintiffs' allegations that defendant Holden unnecessarily prolonged the stop, they likewise do not address any similarly situated individuals who were treated

---

[11] Plaintiffs did submit evidence allegedly showing that 8.9% of defendant Holden's traffic stops were of Hispanic individuals while only 4.2% of other officers' traffic stops in the same district were of Hispanic individuals. (Doc. 57, pgID 1272). Plaintiffs argue that these statistics show defendant Holden was 2.1 times more likely to stop a Hispanic individual than other officers in his district were. *Id.* However, plaintiffs' submission was untimely, and I excluded it. (Minutes of Oral Argument Hearing, June 30, 2021). After summary judgment briefing had closed, I asked each party to submit a list of case citations related to several specific legal issues. Plaintiffs instead submitted a supplemental brief, attaching for the first time statistical evidence that they argue supports their selective enforcement claim. Not only was this evidence outside the scope of my request, but plaintiffs also submitted it more than a year after summary judgment briefing was complete.

differently. They do not provide any evidence showing that traffic stops of Hispanic individuals are longer in duration than traffic stops of non-Hispanic individuals, for example.

As outlined above, plaintiffs rely on the circumstances of the stop to argue that plaintiffs' ethnicity motivated defendant Holden to stop them. But the law is clear that plaintiffs must point to dissimilar treatment of similarly situated individuals. Courts routinely reject selective enforcement claims where plaintiffs failed to provide such evidence. *See*, *e.g.*, *Cunningham v. Sisk*, 136 F. App'x 771, 775 (6th Cir. 2005) (affirming grant of summary judgment where plaintiff "proffered nothing to suggest that similarly situated people (speeders) of different races were treated differently in terms of arrest or search or the issuance of traffic citations"); *Lazcano*, *supra*, 2020 WL 4754340, at *1 (granting summary judgment where plaintiffs did not present evidence of similarly situated individuals and instead relied on the fact that defendant started following their car only after observing the driver's ethnicity).

Plaintiffs argue that a Sixth Circuit decision, *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002), compels me to deny summary judgment on their selective enforcement claim. In that case, a police officer stopped two lawful permanent residents for driving with a faulty headlight. He then ordered them out of the car, walked a drug-sniffing dog around the car, demanded to see their green cards after they had both produced state identification cards, and retained their green cards for several days. The plaintiffs argued that the officer only inquired into their immigration status because they appeared Hispanic.

Because the Sixth Circuit heard the case on an interlocutory appeal, it had to assume the plaintiffs presented sufficient evidence to support their selective enforcement claim. *Id.* at 537.

22

That is, the court assumed that the officers treated Hispanic drivers differently than non-Hispanic drivers.[12] *Id.*

This opinion is not particularly instructive here because the question before me is the question that the Sixth Circuit had to assume the answer to – whether plaintiffs have presented sufficient evidence that defendant Holden treated Hispanic drivers differently than non-Hispanic drivers.

However, in the district court opinion, *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723 (N.D. Ohio 2000), *aff'd and remanded*, 308 F.3d 523 (6th Cir. 2002), I addressed the sufficiency of the plaintiffs' evidence. I found that there was sufficient evidence that the defendants treated Hispanic drivers differently than non-Hispanic drivers because several defendants "testified that, in their experience, they would refer Hispanic motorists to the Border Patrol when, in precisely the same circumstances, they would not refer someone who was white (*i.e.*, not of Hispanic appearance)." *Id.* at 735.

While plaintiffs attempt to analogize these cases by pointing to various portions of defendant Holden's and Agent Mateo's depositions, their testimony is not comparable. Plaintiffs highlight Agent Mateo's testimony that highway patrol officers might ask for his help with identification because he speaks Spanish and his testimony that they have asked him to help identify both non-English speakers and English speakers, but the English speakers were immigrants. (Doc. 50-5, pgID 712). Plaintiffs also point to defendant Holden's testimony that he does not recall specific instances in which he called Border Patrol to help identify a white person when he was not on co-patrol. (Doc. 50-2, pgID 495-96).

---

[12] The main question on appeal was whether the plaintiffs had to show that the officers targeted them solely because of their Hispanic appearance. *Farm Labor*, *supra*, 308 F.3d at 537. The court held that they did not. *Id.* at 539.

But Agent Mateo's testimony does not shed any light on whether defendant Holden treats Hispanic and non-Hispanic drivers differently. The testimony relates to Agent Mateo's experiences overall and not defendant Holden specifically. Plaintiffs bring this case against defendant Holden, not Agent Mateo or the Ohio State Highway Patrol generally. Therefore, they must show that defendant Holden treated the two groups differently, and this testimony does not address that issue.

Furthermore, defendant Holden's testimony regarding his calls to Border Patrol does not establish that he treated Hispanic and non-Hispanic drivers differently. Another court in this district dealt with a similar argument. In *Lazcano*, *supra*, 2020 WL 4754340, at *10, the plaintiffs relied on the defendant officer's testimony that he did not remember ever calling Border Patrol when white or black suspects were involved. However, the defendant also testified that he did not remember whether every time he called Border Patrol, the person involved was Latino. The court found that this testimony only established that the defendant could not remember whether his calls to Border Patrol involved individuals of any specific racial or ethnic group.

Similarly, defendant Holden stated only that he cannot remember whether he ever called Border Patrol to identify a white person while he was not on co-patrol. This testimony only establishes that he cannot recall whether his calls to Border Patrol involved individuals of any particular racial or ethnic group. It does not establish that he only called Border Patrol for Hispanic individuals.

The testimony involved in *Farm Labor* was much more explicit. There, one of the defendants testified that "when he found Hispanic passengers hiding under a blanket, he called the Border Patrol, but that if he found white people hiding under a blanket, he would not." *Farm*

24

*Labor, supra*, 95 F. Supp. 2d at 736. Another testified that "he would not call the Border Patrol regarding a motorist 'unless [he] would think that they would probably be Hispanic in nature.'" *Id.* And another officer testified that "she once had contacted the Border Patrol after coming across two Hispanic men whose car had broken down, but that she wouldn't do the same for a white man." *Id.*

This testimony reveals obvious different treatment between Hispanic and non-Hispanic individuals, unlike the testimony that plaintiffs highlight in this case.

Because plaintiffs have failed to produce any admissible evidence that defendant Holden treated Hispanic drivers differently than non-Hispanic drivers, they cannot make out a claim of selective enforcement. Therefore, I must grant summary judgment on their Fourteenth Amendment claim.

### Conclusion

As to both of their claims, plaintiffs have failed to point to material facts in the record, or disputes relating to such facts, sufficient to overcome defendant's motion for summary judgment. To be sure, the burden of proof as to their Fourth Amendment claim and the stringent legal standard as to their discriminatory enforcement claim make defeating the defendant's motion difficult. Despite the stringency of these doctrines, they are controlling.

It is, therefore,

ORDERED THAT defendant's motion for summary judgment (Doc. 50) be, and the same hereby is granted.


So ordered.

James G. Carr
Sr. U.S. District Judge